691 F.2d 134
 7 Collier Bankr.Cas.2d 376, 9 Bankr.Ct.Dec. 1065
 John W. BITTNER, Isa R. Coble, William T. Galey, Walter B.
Levering, Jr., Walter F. Martin, Andrew T. Rolfe, Robert H.
Smellie, Jr., Mary G. Wilson, and C. Merritt Winsby, and the
class of all persons who were stockholders of the Rolfite
Company on November 30, 1979, Appellants,
v.
BORNE CHEMICAL COMPANY, INC., a corporation of the State of
New Jersey.
 No. 82-5148.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 13, 1982.
Decided Oct. 8, 1982.
 
 Roger C. Ward (argued), Sean R. Kelly, Tamzin McMinn, Pitney, Hardin, Kipp & Szuch, Morristown, N. J., for appellants.
 Frank J. Vecchione (argued), Karen A. Giannelli, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for appellee.
 Before GIBBONS, WEIS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Stockholders of The Rolfite Company appeal from the judgment of the district court, affirming the decision of the bankruptcy court to assign a zero value to their claims in the reorganization proceedings of Borne Chemical Company, Inc. (Borne) under Chapter 11 of the Bankruptcy Code (Code), 11 U.S.C. §§ 1-151326 (Supp. IV 1981). Since the bankruptcy court neither abused its discretionary authority to estimate the value of the claims pursuant to 11 U.S.C. § 502(c)(1) nor relied on clearly erroneous findings of fact, we affirm.
 
 I.
 
 2
 Prior to filing its voluntary petition under Chapter 11 of the Code, Borne commenced a state court action against Rolfite for the alleged pirating of trade secrets and proprietary information from Borne. The Rolfite Company filed a counterclaim, alleging, inter alia, that Borne had tortiously interfered with a proposed merger between Rolfite and the Quaker Chemical Corporation (Quaker) by unilaterally terminating a contract to manufacture Rolfite products and by bringing its suit. Sometime after Borne filed its Chapter 11 petition, the Rolfite stockholders sought relief from the automatic stay so that the state court proceedings might be continued.[1] Borne then filed a motion to disallow temporarily the Rolfite claims until they were finally liquidated in the state court. The bankruptcy court lifted the automatic stay but also granted Borne's motion to disallow temporarily the claims, extending the time within which such claims could be filed and allowed if they should be eventually liquidated.
 
 
 3
 Upon denial of their motion to stay the hearing on confirmation of Borne's reorganization plan, the Rolfite stockholders appealed to the district court, which vacated the temporary disallowance order and directed the bankruptcy court to hold an estimation hearing. The parties agreed to establish guidelines for the submission of evidence at the hearing, and, in accordance with this agreement, the bankruptcy court relied on the parties' choice of relevant pleadings and other documents related to the state court litigation, and on briefs and oral argument. After weighing the evidence, the court assigned a zero value to the Rolfite claims and reinstated its earlier order to disallow temporarily the claims until such time as they might be liquidated in the state court, in effect requiring a waiver of discharge of the Rolfite claims from Borne. Upon appeal, the district court affirmed.
 
 II.
 Section 502(c) of the Code provides:
 
 4
 There shall be estimated for purposes of allowance under this section-
 
 
 5
 (1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the closing of the case....
 
 
 6
 The Code, the Rules of Bankruptcy Procedure, 11 U.S.C. app. (1977), and the Suggested Interim Bankruptcy Rules, 11 U.S.C.A. (1982), are silent as to the manner in which contingent or unliquidated claims are to be estimated. Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue. The principal consideration must be an accommodation to the underlying purposes of the Code. It is conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the issues may be necessary to obtain a reasonably accurate evaluation of the claims. See 3 Collier on Bankruptcy P 502.03 (15th ed. 1981). Such methods, however, usually will run counter to the efficient administration of the bankrupt's estate and where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value. In so doing, the court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. See, e.g., 3 Collier on Bankruptcy P 57.15(3.2) (14th ed. 1977). However, there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code.
 
 
 7
 In reviewing the method[2] by which a bankruptcy court has ascertained the value of a claim under section 502(c)(1), an appellate court may only reverse if the bankruptcy court has abused its discretion.[3] That standard of review is narrow. The appellate court must defer to the congressional intent to accord wide latitude to the decisions of the tribunal in question. Section 502(c)(1) of the Code embodies Congress' determination that the bankruptcy courts are better equipped to evaluate the evidence supporting a particular claim within the context of a particular bankruptcy proceeding. Thus, an appellate court can impose its own judgment only when "the factors considered (by the bankruptcy court) do not accord with those required by the policy underlying the substantive right or if the weight given to those factors is not consistent with that necessary to effectuate that policy...." Gurmankin v. Costanzo, 626 F.2d 1115, 1119-20 (3d Cir. 1980).
 
 
 8
 According to the Rolfite stockholders, the estimate which section 502(c)(1) requires is the present value of the probability that appellants will be successful in their state court action. Thus, if the bankruptcy court should determine as of this date that the Rolfite stockholders' case is not supported by a preponderance or 51% of the evidence but merely by 40%, they apparently would be entitled to have 40% of their claims allowed during the reorganization proceedings, subject to modification if and when the claims are liquidated in state court. The Rolfite stockholders contend that instead of estimating their claims in this manner, the bankruptcy court assessed the ultimate merits and, believing that they could not establish their case by a preponderance of the evidence, valued the claims at zero.
 
 
 9
 We note first that the bankruptcy court did not explicitly draw the distinction that the Rolfite stockholders make. Assuming however that the bankruptcy court did estimate their claims according to their ultimate merits rather than the present value of the probability that they would succeed in their state court action,[4] we cannot find that such a valuation method is an abuse of the discretion conferred by section 502(c)(1).
 
 
 10
 The validity of this estimation must be determined in light of the policy underlying reorganization proceedings. In Chapter 11 of the Code, Congress addressed the complex issues which are raised when a corporation faces mounting financial problems.
 
 
 11
 The modern corporation is a complex and multi-faceted entity. Most corporations do not have a significant market share of the lines of business in which they compete. The success, and even the survival, of a corporation in contemporary markets depends on three elements: First, the ability to attract and hold skilled management; second, the ability to obtain credit; and third, the corporation's ability to project to the public an image of vitality....
 
 
 12
 One cannot overemphasize the advantages of speed and simplicity to both creditors and debtors. Chapter XI allows a debtor to negotiate a plan outside of court and, having reached a settlement with a majority in number and amount of each class of creditors, permits the debtor to bind all unsecured creditors to the terms of the arrangement. From the perspective of creditors, early confirmation of a plan of arrangement: first, generally reduces administrative expenses which have priority over the claims of unsecured creditors; second, permits creditors to receive prompt distributions on their claims with respect to which interest does not accrue after the filing date; and third, increases the ultimate recovery on creditor claims by minimizing the adverse effect on the business which often accompanies efforts to operate an enterprise under the protection of the Bankruptcy Act.
 
 
 13
 124 Cong.Rec. H 11101-H 11102 (daily ed. Sept. 28, 1978) (statement of Rep. D. Edwards of California, floor manager for bankruptcy legislation in the House of Representatives). Thus, in order to realize the goals of Chapter 11, a reorganization must be accomplished quickly and efficiently.
 
 
 14
 If the bankruptcy court estimated the value of the Rolfite stockholders' claims according to the ultimate merits of their state court action, such a valuation method is not inconsistent with the principles which imbue Chapter 11. Those claims are contingent[5] and unliquidated. According to the bankruptcy court's findings of fact, the Rolfite stockholders' chances of ultimately succeeding in the state court action are uncertain at best. Yet, if the court had valued the Rolfite stockholders' claims according to the present probability of success, the Rolfite stockholders might well have acquired a significant, if not controlling, voice in the reorganization proceedings. The interests of those creditors with liquidated claims would have been subject to the Rolfite interests, despite the fact that the state court might ultimately decide against those interests after the reorganization.[6] The bankruptcy court may well have decided that such a situation would at best unduly complicate the reorganization proceedings and at worst undermine Borne's attempts to rehabilitate its business and preserve its assets for the benefit of its creditors and employees.[7] By valuing the ultimate merits of the Rolfite stockholders' claims at zero, and temporarily disallowing them until the final resolution of the state action, the bankruptcy court avoided the possibility of a protracted and inequitable reorganization proceeding while ensuring that Borne will be responsible to pay a dividend on the claims in the event that the state court decides in the Rolfite stockholders' favor.[8] Such a solution is consistent with the Chapter 11 concerns of speed and simplicity but does not deprive the Rolfite stockholders of the right to recover on their contingent claims against Borne.[9]III.
 
 
 15
 The Rolfite stockholders further contend that, regardless of the method which the bankruptcy court used to value their claims, the court based its estimation on incorrect findings of fact. Rule 810 of the Rules of Bankruptcy Procedure permits an appellate court to overturn a bankruptcy referee's findings of fact only when they are clearly erroneous.[10] This standard of review is identical to that required by Rule 52(a) of the Federal Rules of Civil Procedure for findings of fact determined by a trial court sitting without a jury. As is the case when reviewing the discretionary decisions of the bankruptcy court, an appellate court does not have wide latitude to substitute its own judgment for the factual findings of such a court. Only when the appellate court is firmly convinced that the bankruptcy court erred in its findings may these findings be reversed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). A bankruptcy court may not, however, mask its interpretation of the law as findings of fact. In determining the legal merits of a case on which claims such as those of the Rolfite stockholders are based, the bankruptcy court should be guided by the applicable state law. The determination of such law is of course subject to plenary review.
 
 
 16
 The clearly erroneous standard of review is as applicable to a bankruptcy court's ultimate finding of fact as it is to the subsidiary facts on which such a finding is based. As recently noted by the United States Supreme Court:
 
 
 17
 Rule 52 broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a Court of Appeals to accept a district court's findings unless clearly erroneous. It does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with "ultimate" and those that deal with "subsidiary" facts.
 
 
 18
 Pullman-Standard v. Swint, --- U.S. ----, ----, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 
 19
 The Rolfite stockholders urge that "(a)n application of (the clearly erroneous) rule is relaxed where, as here, the initial decision rests, not on the oral testimony of parties and witnesses, but on an examination of documentaries undisputed or stipulated evidence. This principle reflects sensible deference to the equal ability of the appeal court to review and evaluate such evidence." Brief for Appellants at 29-30. We question whether cases suggesting such an interpretation of Rule 52(a)[11] have any continuing authority in light of the interpretation of that rule announced in Pullman-Standard v. Swint. That case recognizes that substituting the factual inferences of one tribunal for those drawn by another does not in any real sense increase the certainty of the factfinding process, but does impinge seriously upon society's interest in the finality of judgments. Only when the trial court's factual findings are clearly erroneous should an appellate court intervene. Then the need to maintain the credibility of judgments outweighs the interest in finality. But in any event, even treating the matter originally, we would draw the same inferences with respect to the value of the claims as did the bankruptcy court.
 
 
 20
 The Rolfite stockholders argue that in assessing the merits of its state court action for the purpose of evaluating their claims against Borne, the bankruptcy court erred both in finding the facts and in applying the law. In reviewing the record according to the standards we have just described, we cannot agree. The first such error to which they point is the bankruptcy court's conclusion that Borne had the right to unilaterally terminate its manufacturing contract upon reasonable notice. While the Rolfite stockholders may quarrel with the bankruptcy court's choice of cases to support this conclusion, the court correctly defined the applicable law. See N.J.Stat.Ann. § 12A:2-309, New Jersey Study Comment 2, and Uniform Commercial Code Comment 7. The court's finding that Borne reasonably terminated its contract with Rolfite is amply supported by the record and thus not clearly erroneous.
 
 
 21
 The Rolfite stockholders also assert that the bankruptcy court erred both in its treatment of their legal theory in the state court and in its finding that Borne did not act with malice. Whether the Rolfite action is characterized as one for malicious prosecution or as one for malicious interference with prospective business advantage, the bankruptcy court correctly found that proof of Borne's malice is an essential element. Again, the record supports the court's factual inference that such malice did not exist. While the evidence does not necessarily compel one to find that Borne had a good-faith claim to those materials which it accuses Rolfite of pirating, a reasonable factfinder has a substantial basis for such a conclusion.
 
 
 22
 Finally, the Rolfite stockholders take issue with the bankruptcy court's determination that the aborted merger with Quaker was not caused by the initiation of Borne's suit. Once again, in light of the several reasonable inferences which can be drawn from Quaker's internal memorandum, this finding is not clearly erroneous.
 
 
 23
 The court's ultimate finding of fact-that the Rolfite stockholders' claims in the reorganization proceeding were worth zero-must also be upheld since it too is not clearly erroneous. The subsidiary findings of the court plainly indicated that the Rolfite counterclaim in the state action lacked legal merit. Faced with only the remote possibility that the state court would find otherwise, the bankruptcy court correctly valued the claims at zero. On the basis of the court's subsidiary findings, such an estimation was consistent both with the claims' present value and with the court's assessment of the ultimate merits.
 
 IV.
 
 24
 The judgment appealed from will be affirmed.
 
 
 
 [1]
 Since the standing of the Rolfite stockholders to pursue these claims under state law was apparently not challenged before the bankruptcy court, we take no position on that issue
 
 
 [2]
 The issue of whether a bankruptcy court used an appropriate method to estimate a claim is distinct from the issue of whether the bankruptcy court reached valid findings of fact. Appellate review of the former is governed by an abuse of discretion standard. Review of the latter is limited by the "clearly erroneous" standard. See infra Section III of this opinion
 
 
 [3]
 An estimate made pursuant to section 57(d) of the Bankruptcy Act, the predecessor to section 502(c)(1) of the Code, was subject to the same standard of review. See 3 Collier on Bankruptcy P 57.15(3.2) (14th ed. 1977) "The bankruptcy court ha[d] exclusive jurisdiction to direct the manner and the time in which such a claim is to be liquidated or estimated as to its amount, and its decision should be subject to review only on the ground of abuse of discretion."
 
 
 [4]
 The Rolfite stockholders have not convincingly established that the bankruptcy court would have assigned their claims a greater value using the estimation method which they propose. See infra Section III of this opinion
 
 
 [5]
 The Rolfite stockholders assert that the claims are not contingent since they are not dependent on some future event which may never occur. In as much as the very existence of the claims in the reorganization proceeding is dependent on a favorable decision by the state court, the Rolfite stockholders are clearly mistaken
 
 
 [6]
 The Rolfite stockholders admitted as much in their first appeal to the district court. Brief for Appellants, Appendix at Pa. 1217-19
 
 
 [7]
 Certainly this consideration played a role in the bankruptcy court's initial decision to disallow the claims. According to the court, "(T)o allow the hotly disputed claims, both present and prospective, herein referenced, would be for all practical purposes to doom Borne's rehabilitation efforts, now nearing their final stages, defeating the very purpose of reorganization...." Brief for Appellants, Appendix at Pa. 30
 
 
 [8]
 While the "equitable considerations" referred to by the bankruptcy court could have properly influenced the method of evaluation of the claims chosen by the court, they would not have permitted the court to evaluate as zero claims which in fact have a higher value under the method of evaluation chosen by the bankruptcy court. But because we find that the bankruptcy court did not err in its evaluation of the claims, the error, if any, in the court's references to "equitable considerations" as buttressing its decision would not affect the outcome
 
 
 [9]
 The Rolfite stockholders apparently contend that in barring them from voting on the reorganization plan, the bankruptcy court deprived them of a property right without due process of law. Congress has given the bankruptcy courts broad discretion to estimate a claim pursuant to section 502(c)(1). As classic economic regulation, the federal bankruptcy laws need only be supportable on a rational basis to survive substantive due process challenges. See In re Ashe, 669 F.2d 105, 110 (3d Cir. 1982). A bankruptcy court's discretion to treat a contingent, unliquidated claim as did the court here is undoubtedly rationally related to the legitimate governmental interests expressed in Chapter 11
 
 
 [10]
 Those bankruptcy rules which predate the Code are to remain in effect until repealed or superceded by new rules. Bankruptcy Code, Pub.L. 95-598, tit. IV, § 405(d) (1978)
 
 
 [11]
 Shumaker v. Groboski Industries, Inc., 352 F.2d 837, 840 (7th Cir. 1965); Seagrave Corp. v. Mount, 212 F.2d 389, 394 (6th Cir. 1954); Orvis v. Higgins, 180 F.2d 537, 539-40 (2d Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 596 (1950)